VERN PASCOE, Appellee, v. FRANKLIN COUNTY STATE BANK, Appellant, E. J. KNOLL et al., Defendants.

· No. 42073.

NOVEMBER 21, 1933.

R. L. Saley, and Senneff, Bliss & Senneff, for appellant Franklin County State Bank.

D. M. Kelleher, and F. J. McGreevy, for appellee Pascoe.

R. R. Stuart, for Wilbur Scantlebury.

DONECAN, J.—F. J. Scantlebury was the owner of a large amount of land in Franklin county, Iowa, and for many years had been engaged extensively in the live stock business. This business was carried on at Hampton, Iowa. Large quantities of live stock bought by him, as well as stock from his own farms, were assembled in the stockyards at Hampton, and from this point shipments were made either by truck to Armour & Co. at Iowa Falls, Iowa, or by railroad to Chicago. E. J. Knoll had been associated with Scantlebury for several years, part of the time as a partner in the livestock business and a part of the time as an employee. Scantlebury was a stockholder and also a director and vice president of Franklin County State Bank, defendant-appellant. For several years Scantlebury had been in failing financial circumstances and at the times involved in this action he was insolvent. The lands owned by Scantlebury were heavily incumbered, and among such incumbrances was a second mortgage for $19,000 held by the defendant-appellant bank. Some of Scantlebury's indebtedness to said bank had been charged off, but in addition to the amount secured by said second mortgage he owed the bank a large amount, and the bank held an insurance policy for $20,000 on his life as collateral.

Scantlebury carried an account in the Franklin County State Bank. For several months prior to February 6, 1932, he was short on working capital, and during the summer of 1931 he had made arrangements with the cashier of said bank to honor checks written by him in payment of live stock purchased. Under this arrangement, although the funds in his account frequently were not sufficient to meet the checks when presented, all checks were paid by the bank, and the overdrafts thus created were not charged to him on the books of the bank, but were carried as "cash items" until such time as the bank account would be replenished by the proceeds of the sales of live stock made by Scantlebury. When such live stock

was sold and trucked to Iowa Falls, a check from Armour & Co. in payment thereof would be deposited by Scantlebury, usually the same day or the day following delivery. When stock was shipped to Chicago, a sight draft would be drawn by the Franklin County State Bank upon a commission house in Chicago, attached to the bill of lading and forwarded to a bank in Chicago, and the account of Scantlebury in the Franklin County State Bank credited with the amount of such sight draft. Scantlebury's health began to fail toward the end of the year 1931, and he died February 24, 1932. Some time about the middle of January, 1932, he was confined to his home and unable to look after his business, and thereafter, the business of buying and selling stock was attended to by E. J. Knoll. The business was conducted in practically the same manner as it had been conducted by Scantlebury, the checks in payment of stock purchased being drawn on Scantlebury's account by Knoll by authority of Scantlebury with the permission of the bank. Checks for stock sold to Armour & Co. at Iowa Falls were delivered to the bank upon receipt of same, and sight drafts for stock shipped to Chicago were issued and forwarded the same as had been done by Scantlebury prior to this time.

On the 6th day of February, 1932, said Knoll made a large shipment of stock, consisting of both cattle and hogs, to Chicago. This stock had all been purchased immediately prior to February 6th for delivery on that day. On the morning of February 6th, about 9 o'clock, Knoll visited the defendant bank, and there talked to Mr. Wolf, the cashier. Knoll told Wolf, in substance, that he was shipping a lot of stock that day, that some of the men from whom stock was purchased would get their checks cashed right away, and that he might as well draw a sight draft that morning for $1,500. He also claims to have told Wolf that he had another lot of stock coming that day from one man, that he did not know exactly what this would come to, but that it would be a pretty big check, and suggested that he sign a second draft leaving the amount blank, and that when he found out how much he needed for this stock he would call Wolf up and give him the amount. Wolf agreed to the arrangement, and a sight draft for $1,500 and also a sight draft in which the amount was left blank were both signed by Knoll. About 4 o'clock in the afternoon of the same day, Knoll called Wolf at the bank and told him to fill in the second draft for $2,500. The stock which was delivered during the day and

for payment of which Knoll directed that the draft for $2,500 be issued, so that he might check against the credit thus provided, was stock purchased from the plaintiff-appellee, Vern Pascoe, and the total of the check issued to Pascoe for such stock was $2,509.02. Instead of proceeding immediately to the bank and having his check cashed, it being after banking hours, Pascoe proceeded to his home, which was near Chapin in Franklin county. The 6th day of February was a Saturday, and on the following Monday, February 8th, Pascoe took his check to the First National Bank of Sheffield, deposited it, and received credit for it. The check was then sent by the First National Bank of Sheffield to the Citizens National Bank of Hampton, and on Tuesday, February 9th, upon this check being presented to the Franklin County State Bank, payment was refused on account of insufficient funds. Following the refusal of payment of Pascoe's check, he commenced this action in equity. From a decree in favor of the plaintiff, the defendant bank appeals.

Several propositions have been presented and argued by the parties, which, in the view we take of this case, it is not necessary to consider in this opinion.

Plaintiff-appellee alleged, in substance, that for a period of several months before February 6, 1932, the defendant bank, through its officers, had an oral arrangement and agreement with said Scantlebury, under the terms of which the bank was to supply working capital to enable Scantlebury to carry on purchases of live stock by issuing checks in the ordinary form to persons from whom stock was purchased; that, pursuant to such agreement, Scantlebury delivered the checks received by him from the sale of stock or the sight drafts issued in connection with such sale to the bank; that, pending the receipt of the proceeds of the sales of such stock by Scantlebury, the bank cashed the checks delivered to the persons from whom such stock had been purchased and carried the overdrafts thus brought about until the proceeds of such sales by Scantlebury were received by the bank. We think the evidence is sufficient to show that such arrangement was made between the bank and Scantlebury some time during the summer of 1931; that, pursuant to such arrangement, the bank did pay checks drawn by Scantlebury for the purchase of stock when there were no funds in the bank to Scantlebury's credit against which such checks could be charged; that, pending the sales of such stock by Scantlebury and the receipt of the proceeds thereof, the bank, on frequent oc-

casions. carried such overdrafts in Scantlebury's account as "cash items"; that, in making such arrangement and in carrying out the same, the bank must have known, and did know, that Scantlebury did not have sufficient working capital to carry on his business without his overdrafts being honored by the bank; that, while the arrangement had reference to overdrafts in connection with the purchase of stock by Scantlebury, the bank did not insist upon the checks causing such overdrafts being limited to checks given in payment for stock; that on November 12, 1931, the bank cashed a check against the Scantlebury account for $1,225.75, given in payment of Scantlebury's taxes, and on November 19th cashed another check for $483.80 against Scantlebury's account given in payment of insurance premiums; that in recognizing and cashing said checks the bank knew that they were not given for stock purchased, and that by cashing them the working capital of Scantlebury would be still further decreased; that, on account of the payment of said two checks, the overdrafts against Scantlebury's account from that time forward became larger and more frequent; that, in allowing said checks to be cashed, the bank was in reality acting in its own interests, because the bank held a second mortgage against Scantlebury's land on which it was important that the taxes be paid, and because it also held as collateral the insurance policy on which said premium was paid; that Knoll knew nothing of the condition of said Scantlebury's bank account; that, although Scantlebury was unable to attend to his business and Knoll conducted the same from some time about the middle of January, 1932, and there were frequent and large overdrafts against Scantlebury's account during that time which the bank continued to carry as cash, the bank never informed Knoll of the condition of Scantlebury's account and never suggested that it could not, or would not, continue to honor the checks issued against the same.

It is quite apparent, therefore, that the bank not only did not raise any objection to carrying out the arrangement which it had made with Scantlebury, after he became unable to look after the business and Knoll took charge of the same, but that it acquiesced in, and by its conduct consented to, the continuance of the business under such arrangement. In addition to this, Knoll testified that about ten days or two weeks before February 6th, when Scantlebury's condition became such that he was no longer able to give any attention to his affairs, Knoll had a talk about the business with

Ridgeway, the president, Wolf, the cashier, and Inglis, the assistant cashier, of the bank; that he told them, in substance, that he would quit buying stock because he knew nothing about the condition of the business and was afraid he might be blamed if anything went wrong; and that Ridgeway, in the presence of the others, told him not to quit while Scantlebury was down in bed, that this would ruin the business, and that he, Knoll, should continue as he had been doing. He further testified that, after payment had been refused on the Pascoe check, he talked to Mr. Wolf and wanted to know why the check had not been honored, and was then, for the first time told about overdrafts against the Scantlebury account; that he told Wolf that, if he had known that Scantlebury's account was in that shape, he would not have bought this stock, and that he (Knoll) should have been informed that there was an overdraft; Wolf told him that it wasn't any of his (Knoll's) business about the bank account, that he was supposed to draw checks for stock and wasn't supposed to know about the bank account. This testimony on the part of Knoll is denied by Ridgeway, Wolf, and Inglis, but the conduct of the bank's officers and the circumstances surrounding the whole transaction incline us to believe that it is true.

It would seem to be a reasonable inference that for some time prior to February 6, 1932, the bank must have known that the checks representing overdrafts, which it was carrying as "cash items", were being paid out of proceeds received from later shipments of stock and not out of proceeds derived from the sales of stock in payment for which such checks had been made out by Knoll. It also seems a reasonable inference that the bank must have known that Scantlebury was at that time in an insolvent condition, and that, whenever payment of the overdrafts was stopped, there would be large amounts represented by checks which the bank was carrying as cash items. With the beginning of business on the morning of February 6, 1932, there was a balance of $11.90 in Scantlebury's account. At that same time the bank had in its drawer three checks which it had paid but not charged to Scantlebury's account on the books. Two of these checks for $1,005.72 and $676.34, respectively, had been paid January 25, 1932, and carried as cash items since that date. The other check, which was for $532.31, had been paid February 5, 1932, and carried as a cash item. The aggregate of these three checks, $2,214.37, represented over-

drafts which, however, were not shown as overdrafts on the books of the bank, but as "cash items".

If, at that time, on the morning of February 6, 1932, the bank had terminated its arrangement with Scantlebury, after applying the $11.90 then in the account in payment of the overdrafts, it would have faced a loss of $2,202.37. But the bank did not terminate its arrangement with Scantlebury at that time. Instead, it took the two sight drafts aggregating $4,000 and credited them to Scantlebury's account, and, knowing that Knoll would give checks against the account in approximately the same aggregate amount to the persons from whom stock had been purchased, it immediately proceeded to pay the overdrafts, most of which it had been carrying as "cash items" for almost two weeks. The inevitable result was that the overdrafts were paid and wiped out, the bank released from a loss the risk of which it had assumed by its arrangement with Scantlebury, and the loss shifted to Pascoe.

The evidence is uncontradicted that Knoll had no knowledge of the overdrafts. Even without this testimony we could not assume that he would deliberately take the risk of writing checks for stock purchased, knowing that there was not money enough to meet such checks, unless he had reason to believe that such checks would be honored by the bank. The bank's conduct in paying the overdrafts prior to the 6th day of February, 1932, and in failing to call Knoll's attention to such overdrafts, is sufficient to show the bank's acquiescence in and satisfaction with the procedure followed by Knoll in checking against the Scantlebury account. The testimony of Knoll and the conduct of the bank, as well as the other facts and circumstances, indicate that the bank knew that, when stock was purchased by Knoll, Knoll understood that the checks given by him in payment for such stock would be paid by the bank, that he relied upon the bank's paying such checks, and that, if it had not been for such reliance on the checks being paid by the bank, Knoll would not have continued the business of buying stock for Scantlebury. In other words, the bank by its arrangement with Scantlebury, by its conduct in continuing to pay checks written by Knoll after he had taken charge of the business of Scantlebury, and by encouraging him to continue writing checks for stock purchased, was itself responsible for the condition which confronted it.

In view of all the facts and circumstances in this case; in view especially of the conversation which Knoll claims to have had with

Ridgeway, Wolf, and Inglis, in which he suggested discontinuing the purchase of stock and was encouraged to go on with Scantlebury's business; and in view of the fact that the bank must then have known that the checks then outstanding could not be paid out of the balance then in Scantlebury's account, we think the bank may be held to have impliedly agreed with Knoll that all checks written by him for the purchase of stock would be paid; and that, if the funds in the bank were not sufficient to pay the same, a sufficient amount to pay such checks would be loaned by the bank for the benefit of Scantlebury's account. If this be not true, then the alternative conclusion which the evidence seems to warrant, is that the bank, realizing Scantlebury's insolvency, undertook to avoid its liability for the overdrafts held and carried by it as cash on February 6, 1932, by encouraging the purchase of the live stock which was that day shipped to Chicago, and in connection with which the drafts aggregating $4,000 were issued, for the purpose of providing a credit in the Scantlebury account out of which it would pay such overdrafts and avert the loss with which it was threatened. We prefer to hold that the evidence supports such a contract, rather than that the bank deliberately undertook to profit at the expense of an innocent party.

The evidence leaves some uncertainty as to the exact amount of proceeds derived from the Pascoe stock when sold in Chicago. There is no doubt, however, that the net proceeds of all the stock shipped on that day amounted to more than the $4,000 for which sight drafts had been issued by the bank and credited to the Scantlebury account. We think the evidence is also sufficient to show that the net proceeds derived from the sale of the Pascoe stock were more than $2,509.02, the amount of the check given to Pascoe in payment for stock purchased from him. The trial court fixed the amount of plaintiff's recovery at $2,214.37, with interest from February 6, 1932, and costs. This amount represented the aggregate of the overdrafts caused by the three checks which were carried as "cash items" on February 6, 1932, and which on that day were charged against the credit in the Scantlebury account derived from the sight drafts for $1,500 and $2,500, respectively. In our opinion, the bank is liable to Pascoe for the full amount of the check given to him by Knoll, and a judgment should be entered in favor of Pascoe and against the bank for the sum of $2,509.02, with interest thereon from the 9th day of February, 1932, the day on which

the check was presented to the bank and payment refused, and for costs. Except as to the amount of the judgment, which is herein modified, the decree of the trial court is therefore affirmed.

Modified and affirmed.

ALBERT, C. J., and STEVENS, KINDIG, and CLAUSSEN, JJ., concur.